## AFFIDAVIT OF BORDER PATROL AGENT TRENT HINCHCLIFF

Your affiant, Trent Hinchcliff, a Border Patrol Agent of the United States Border Patrol, being duly sworn, does depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1) I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. I am a Border Patrol Intelligence Agent (BPA-I) with the United States Border Patrol (USBP) assigned to the Douglas Border Patrol Station in Douglas, AZ. I have been an agent with the USBP since March 06, 2008. I completed the USBP Academy, where I received instruction in constitutional law, immigration law, criminal law, and federal and civil statutes. I have also received instruction in the detection, interdiction and arrest of narcotics smugglers, human smuggler, and individuals illegally present in the United States. As a Border Patrol Agent (BPA), I have received instruction in interviewing and interrogation and formal training in evidence collection.

2) I have been assigned investigative duties with the Tucson Sector Tucson Intelligence Unit since April 2016. I routinely investigate violations of Title 21, Title 19, Title 18, and Title 8 of the United States Code, as well as various other federal law violations. I prepare investigative reports regarding criminal misconduct, intelligence, background matrix, criminal history matrix and allegations of wrongdoing and their outcomes. I provide supporting documentation of investigations conducted, to include both testimonial and physical evidence. Assigned liaisons with federal, state, local and foreign law enforcement and civilian agencies have become an integral part of my daily operations.

3) I routinely conduct surveillance and counter surveillance to protect operational integrity

and security, as well as investigate violations of federal law. I access multiple databases and intelligence-based systems and through my investigations, have assisted in interagency and international investigations, as well as applied additional charges to defendants that field agents were not aware of at the time of apprehension. I have assisted in the execution of probable cause warrants for arrests, electronic devices, conveyances, and dwellings.

4) From November 2013 to November 2015, I was assigned to the Brian A. Terry Border Patrol Station's Alien Smuggling Identification and Deterrence (ASID) Unit. During my time there I became familiar with the criminal networks operating in Cochise County and Mexico. I conducted daily interviews of subjects involved in criminal activity, including alien smuggling and narcotic smuggling. In addition, I collected cellphone data and other evidence that was used to develop an understanding of different criminal networks and to develop criminal investigations. I also developed, or assisted in development, criminal cases that led to the successful prosecution of several subjects involved in smuggling.

5) Prior to initiating my law enforcement career, I attended Boise State University in Boise, Idaho. There, I graduated with a bachelor's degree in economics in 2006.

6) The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents and on my experience as a Border Patrol Agent in the USBP. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the suspects/defendants referred to in this investigation conspired with each other and other known and unknown individuals, wherein they jointly facilitated, either verbally or electronically, the movement of undocumented noncitizens into and within the United States. This affidavit is intended to show only that there exists sufficient probable cause for the requested

warrant and does not portray all my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7) The property to be searched consists of one cellular phone. The cellular phone to be examined is a black Samsung cellphone, placed in a sealed evidence bag with the number A8641188 (which shall hereafter be referred to as Target Phone 1). Target Phone 1 is currently in the physical custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, in the vault at 1608 N Kings Highway, Douglas, Arizona, placed in a sealed Department of Homeland Security Evidence Bag with a signed Form 6051S Custody Receipt for Seized Property and Evidence. Target Phone 1 is further described in Attachment A, which is incorporated herein by reference.

8) The requested warrant would authorize the forensic examination of Target Phone 1 for the purpose of identifying electronically stored data as more fully described in Attachment B.

## PROBABLE CAUSE

9) On May 25, 2024, approximately 2:39 p.m., a Border Patrol Agent (BPA) received a call over his service radio from the Douglas Station's Tactical Operations Center (TOC) stating that a sensor had captured suspected undocumented noncitizens illegally crossing the International Border Fence near milepost 13 on Geronimo Trail Road (GTR), a rural dirt road used mainly by ranchers to access their lands, with little recreational purpose for general traffic. At approximately 2:43 p.m., the TOC gained visual of a vehicle, later identified as a 2016 Ram 1500 (AZ LIC: NVA4PV), heading westbound towards Douglas from where the sensor was activated. Due to the proximity of the international border fence to GTR, the BPA determined that there was a high likelihood that the undocumented noncitizens may have been picked up by the Ram 1500.

10) BPAs responded to the area, located the vehicle, made observations, and began to follow the vehicle as it continued westbound. BPAs requested records checks on the vehicle and were notified that the vehicle had an alert for being possibly involved in transporting undocumented noncitizens within the United States. At approximately 3:10 p.m., BPAs performed a vehicle stop on the Ram 1500 and the driver yielded near mm 1 on GTR. When questioned on where they were coming from the driver, later identified as Gloria Maria Aguilar-Cabrera, stated that they were heading back from "an adventure" then later changed her statement to them returning from Slaughter Ranch, near mm 14 on GTR. BPA Montano Perez then asked to two occupants in the rear passenger seats for identification to confirm their citizenship. They each provided an Arizona driver's license, but later in the investigation were determined to be citizens of Mexico without authorization to be in the United States.

11) At approximately 3:13 p.m. as BPAs were questioning the validity of the licenses, Aguilar-Cabrera drove off from the stop and began driving westbound at a high rate of speed. BPAs did not pursue for community safety but continued westbound at the speed limit and at a safe distance to see if the vehicle's occupants would bailout or stop. At approximately 3:14 p.m., BPAs were notified that two people had bailed out of the vehicle near Green Gate on GTR. At approximately 3:20 PM, Douglas Police Department (DPD) notified the TOC that they had found a Ram 1500 with a matching description behind a residence in Douglas, AZ. BPAs arrived on scene and confirmed that the vehicle's license plate was the same as the one that fled earlier. Agents responding to the bail out apprehended three subjects, including the two backseat passengers, both determined to be undocumented noncitizens who had recently illegally entered the United States from Mexico, and the front seat juvenile United States Citizen later identified as A.C.M. (YOB: 2007).

12) A.C.M. was in possession of a Samsung cellphone, **Target Phone 1** as well as Aguilar-Cabrera's identification, credit card, and debit card. A.C.M. said **Target Phone 1** belonged to Aguilar-Cabrera. A.C.M. said that he crossed through the Douglas, Arizona Port of Entry in the Ram earlier in the day, with Aguilar-Cabrera driving. According to A.C.M., Aguilar-Cabrera was the driver of the Ram when they picked up the illegal migrants. BPA body camera recording also captured Aguilar-Cabrera's face on video at the time of the vehicle stop and records the driver giving the BPA her full name of "Gloria Aguilar-Cabrera". Crossing records show that Aguilar-Cabrera entered the United States with A.C.M. at 1:28 p.m. in the mentioned Ram. A.C.M. stated they drove out to a dirt road. They waited there about 15 minutes before a contact "Cheno" told them "pollos" had already crossed. A.C.M stated that people entered the truck from the brush. A.C.M. said he was going to get paid $300 per person smuggled.

13) Aguilar-Cabrera was not located that day, but BPAs arrested her on May 30, 2024, during another alien smuggling event where she was transporting four undocumented noncitizens and again fled from law enforcement. Her two felony cases are under case numbers 24-mj-07634 and 24-mj-00540.

14) On February 7, 2024, two individuals were arrested for transporting four illegal migrants in the Willcox, Arizona Border Patrol Station's Area of Responsibility. When interviewed by BPAs, one of them said that they were receiving instruction for human smuggling by a woman known as "Maria" and "Gloria" who was using phone number (602) 817 8224 to relay instructions for human smuggling. Money remittance records link the phone number (602) 817 8224 to Gloria Maria Aguilar-Cabrera.

15) In my training and experience, Human Smugglers operating in Cochise County, Arizona use social media, text messaging, phone calls, and other applications to communicate and coordinate

the illicit activities. The transportation cell of a Human Smuggling Network needs to receive real time instruction from scouts and groups that are ready to be picked up. Vehicle drivers also need to receive instructions on where to transport the undocumented noncitizens. Human Smuggling Networks in Mexico also like to know the names of the undocumented noncitizens that were picked up successfully.

16) Since the date of the arrest, **Target Phone 1** has been in the storage in the Douglas Border Patrol Station's evidence vault located at 1608 N Kings Highway, Douglas, Arizona. **Target Phone 1** has been stored in such a manner that their contents, to the best of my knowledge, are in substantially the same state as when it first came into possession of the USBP.

## TECHNICAL TERMS

17) Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

18) Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

19) Portable media player. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

20) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user

to transmit electronic messages via standard email services or specially designed communication applications between parties.

21) Based on my training, experience, and research, I know that **Target Phone 1** has capabilities that allow them to serve as wireless telephones, digital cameras, and portable media players. I also know that Target Phone 1 can be used to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22) Based on my knowledge, training, and experience, I know that electronic devices such as **Target Phone 1** in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

23) As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Target Phone 1** was used, where it was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on **Target Phone 1** and is more fully set forth in the factual section contained herein and because:

    A.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

    B.    Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    C.    A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    D.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of the Target Phone (Target Phone 1) did not have a relationship with the party.

24) *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Target Phone 1** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

25) *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize the execution of the warrant at any time in the day or night.

/ / /

/ /

/

## CONCLUSION

26) I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Target Phone 1** described in Attachment A to seek the items described in Attachment B.

*Trent Hinchcliff*
Border Patrol Agent
United States Border Patrol

Subscribed and sworn to telephonically,

this __25th__ day of June, 2024:

HON. ERIC J. MARKOVICH
United States Magistrate Judge, District of Arizona